SCHULTZ, Appellant, vs. FRANKFORT MARINE, ACCIDENT & PLATE GLASS INSURANCE COMPANY and others, Respondents.

*December 10, 1912—January 7, 1913.*

*Conspiracy: When actionable: "Open or rough shadowing:" Bringing person into public disrepute: Preventing freedom of action: Aggravating circumstances: Joint and several liability: Acts of one conspirator binding on all: Liability of master for torts of servant: Evidence: Weight and sufficiency: Mitigation of damages: Conclusions of fact: Leading questions.*

1. One who has knowledge that detectives in his employ or under · his control propose to engage in "open or rough shadowing" of a person under surveillance, and consents thereto, cannot escape liability therefor on the plea that he did not know what the term meant.

2. A conspiracy to libel a person or to commit any other wrong to his person, reputation, or property may, when damage follows, be the subject of a civil action.

3. "Open or rough shadowing," which consists in openly and publicly following and watching a person, being calculated to publish him as suspect and to bring him into public disrepute, ridicule, and contempt, is an unlawful act, and a conspiracy to do such act is actionable.

4. When such open or rough shadowing is accompanied by acts of trespass such as entry into plaintiff's house and pursuing him into his attorney's office, and by threats, insults, eavesdropping, and ambiguous and uncalled-for communications with his employer, these constitute circumstances of aggravation for which the persons taking part in the conspiracy are liable.

5. In such a case the evidence of the defendants as to what their purpose was in the surveillance is not conclusive on the court or jury, but the plaintiff may show by circumstantial or other evidence, and the jury may find therefrom, that the purpose was different from that claimed.

6. The liability of conspirators to civil damages is joint and several, and, when the existence of a conspiracy has been shown *prima facie*, the plaintiff may give in evidence as bearing upon his damages the acts and sayings of any conspirator done or spoken in pursuit of the common purpose, whether that conspirator be a party or not.

7. Such acts and sayings are evidence against other conspirators, not under the rule *respondeat superior*, but under the law of

conspiracy, which makes each the agent and spokesman of all engaged in the unlawful enterprise. The plaintiff may, however, invoke either rule for the purpose of connecting any of the parties with the tort.

8. A purpose to prevent a person from leaving the state or the city of his residence until it is determined whether or not to have him arrested, is in itself not a lawful purpose to be undertaken by private individuals.

9. Surveillance for such purpose, if maliciously done, is a violation of sec. 4466a, Stats., and gives to the injured party a cause of action.

10. In an action for damages for a conspiracy to injure plaintiff by open and rough shadowing, defendants may show in mitigation of damages that their intentions were good, that the acts complained of were done without malice and in pursuance of a supposed legal duty, or that the plaintiff's reputation was so bad that the acts of the defendants were not likely to injure him much, if at all; but such facts do not constitute a justification or defense.

11. Conclusions of fact are not always inadmissible in evidence. So far as they relate to collateral facts not directly in issue, they often save much delay and circumlocution, and hence should not be too rigidly excluded; and the same is true of leading questions.

APPEAL from a judgment of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Reversed.*

For the appellant there was a brief signed by *Charles Friend,* attorney, and *W. B. Rubin* and *Horace B. Walmsley,* of counsel, and oral argument by *Mr. Rubin.*

For the respondents there was a brief by *Doe & Ballhorn* and *Paul D. Durant,* and oral argument by *J. B. Doe.*

TIMLIN, J. This action is against an employers' liability insurance company, its resident agent, *Julius Bacher, Frederick P. Gordon,* the manager of the Riemer National Detective Bureau, an incorporated private detective agency, and *John Paczkowski,* a private detective in the employment of said detective agency. The plaintiff, whose real name is *Anton Sobjak,* had a stepfather named Schultz, and he as-

sumed the latter name and has been known by it for about eighteen years. He was a laborer thirty-seven years of age, and with his wife and four children resided some distance from the business or down-town district in Milwaukee in a house about nine feet back from the sidewalk, having a hallway used as an entrance to plaintiff's and other apartments in the same house. He had been convicted of larceny once and pardoned, and had been addicted to strong drink. In an action for damages in which the insurance company defendant was interested as insurer, *Anthony Schultz* had been called as a witness and testified on the part of the plaintiff. There was in that case a verdict for the plaintiff, and a motion for a new trial was pending therein in March, 1910. The defendants are charged in the complaint with a conspiracy for the purpose of annoying, harassing, and intimidating the plaintiff in order to get him to leave the city of Milwaukee and refrain from testifying as a witness in said action in case a new trial should be granted therein.

It is averred that for the purpose of carrying out this conspiracy and in furtherance thereof the defendants caused the plaintiff to be followed and shadowed, keeping him under constant surveillance day and night, and also set men to watch plaintiff's home and to eavesdrop upon his home, threatened him with great bodily violence, induced his employer to discharge him, and gave out and made known to plaintiff's neighbors that plaintiff was being watched and shadowed, threatened plaintiff with criminal prosecution, and gave out and threatened that they would cause him to disappear and be kidnaped. That defendants thereby falsely imprisoned the plaintiff and restrained him of his liberty. It is then averred that by reason of these wrongful acts the plaintiff was put in great fear and mental anguish and prevented from coming and going as he pleased, and his reputation and good name defamed, to his injury in all in the sum of $5,000.

The pleading is not well or skilfully drawn, but it is suffi-

cient under the liberal rules of pleading obtaining in this state, and it is believed the foregoing is a fair synopsis of its contents. The defendants answered to the merits, denying the conspiracy and the wrongful purpose alleged, admitted that the defendant *Bacher,* for and on behalf of the defendant insurance company, employed the said detective agency to keep watch of the plaintiff, and that the defendant *Paczkowski,* under directions of and as an employee of this detective agency, did watch the plaintiff.

On the part of the plaintiff evidence was introduced tending to show that the insurance company employed the detective agency, that *Bacher* and *Gordon* took part in discussing the subject, and that the defendant *Gordon,* representing the detective agency, advised rough and open shadowing of the plaintiff, and that this kind of shadowing was employed, to the knowledge of all the defendants and with their consent. Rough shadowing means that those engaged in so doing are not obliged to conceal the fact that the subject of surveillance is being shadowed or followed, but it is done so openly that the subject or the general public or both may know of it. The employees of the detective agency were told by defendant *Gordon* to do open or rough shadowing in this case, as he states, upon the presumption that plaintiff would know he was being shadowed and it would have the moral effect on him of keeping him in town. It appeared that the defendant *Paczkowski,* an employee of the detective agency, co-operating with another employee of this agency named Heyer, about March 7, 1910, as directed by the defendant *Gordon,* with the consent and at the instigation of the defendant *Bacher* and the insurance company, took up the work of shadowing the plaintiff. There is testimony offered on the part of the plaintiff tending to show that these two employees of the said detective agency were acting together in pursuance of a common purpose, were under the directions of *Gordon,* manager of the agency, who contracted for this purpose with the in-

surance company through *Bacher,* another agent of that company, and they made daily reports to *Gordon,* who transmitted them to the representatives of the insurance company, so that all defendants were at all times operating and acting and counseling together in pursuance of a common design and with a common purpose. Heyer, while occupying this attitude to plaintiff, entered plaintiff's house unbidden, threatened the plaintiff, entered plaintiff's yard, and one or both intruded upon plaintiff's premises several times, tiptoeing into the hall, apparently listening at the doors and retreating when the doors were opened. The plaintiff said:

"They kept coming and annoying us day by day. They kept opening the doors, the hallway doors, five or six different times, and looking into the hallway. They opened doors on different days. When he [Heyer] opened the door he would say, 'Get in there.' He would look smiling when he said 'Get in there.' "

The other man, *Paczkowski,* told the plaintiff that if he would not go out of town he would fix him up. Heyer also told the plaintiff he was under arrest. Heyer carried a "gun" in his hip pocket. *Paczkowski* was seen by the witness Robanski eavesdropping on the stairway leading into plaintiff's house at 11 o'clock p. m. Pinkolski also saw them, and they made themselves and their watch in front of plaintiff's house so constant, conspicuous, and notorious that on one occasion a crowd of some 200 persons collected and threatened violence. According to Polaski, Heyer, while engaged in watching, told the witness he was watching *Tony Schultz* and there was some silverware missing from a boat, and Heyer showed witness a star and said he (*Schultz*) is in arrest. This witness also saw Heyer go into *Schultz's* house and saw the crowd assembled. Mary Denbowski lived in the next house to plaintiff, and she gave similar testimony of acts which the jury under proper instructions might have found to constitute eavesdropping.

From the beginning of this rough shadowing, so called, the plaintiff was followed openly and persistently by two detectives who made daily reports to the defendant *Gordon,* manager of the detective agency, and these reports were by the latter turned over to the insurance company and *Bacher.* After calling the attention of all the plaintiff's neighbors to the fact that he was being watched, threatening him, eavesdropping upon his premises, and making themselves unnecessarily conspicuous passing up and down on the sidewalk in front of his house, they were requested to let the man alone and were told that they were annoying him; that he was complaining of their presence. The subordinate detectives refused to do so and told Mr. Foster, who made the request, that it was none of his business. *Mr. Gordon,* as a witness on the stand, meets that situation in this way: "Answer. I don't believe I gave much thought to any instructions that the men may have said they received from you and Foster; we were hired to do what we were asked to do and we did it." Mr. Foster, an attorney at law employed in Mr. Rubin's office, went out to the residence of the plaintiff on Greenbush street several times and remonstrated against this treatment of plaintiff; the last time he went for the purpose of bringing the plaintiff down town to Rubin's office. When Foster and the plaintiff started these two detectives followed, entered the same street car, and followed them into the Plankinton House, where Mr. Foster went to use the telephone, from there onto the street, from there into Mr. Rubin's office, where *Schultz* was attempting to consult with his attorney, being brought there by Mr. Foster for that purpose. *Paczkowski* entered the office, was requested by Rubin to leave, but did not leave at once upon such request; after a short time he went out in the hall and remained near the door and Mr. Rubin came out and ordered him away, when an affray took place between this man and Rubin. Mr. Rubin, Mr. Foster, and *Mr. Schultz* then went to the police headquarters of the city of Milwaukee

for the purpose of making complaint against this annoyance and the detective followed them there; there appeared *Mr. Gordon,* and there they were refused protection by the lawful police of the city on the absurd ground that the detective agency was incorporated. They then began this action by service of a summons and affidavit for examination, and the defendants or some of them had a meeting and resolved to continue the rough shadowing after the affidavit was served upon them, and they did so.

A verdict was directed for the defendants and the appellant contends this was error. His counsel is somewhat vague with reference to what particular rule of law existing for the protection of persons was breached by the acts and combination of defendants, and suggests that the combination and conduct complained of was for the purpose of carrying out, to the damage of plaintiff, that species of disorderly and unlawful conduct called eavesdropping, or constituted such restraint of plaintiff's liberty as to amount to false imprisonment, or that it was an invasion of a right to privacy or constituted an injury to the reputation. The respondents seek to support the judgment upon the broad ground that the open shadowing or surveillance of plaintiff by persons not officers of the law, for the purpose of keeping themselves informed of his whereabouts for a time and until such private persons determine whether or no they will apply for a criminal warrant against the person shadowed or watched, is not an actionable wrong; hence that combination or confederacy for such purpose, where no unlawful means are resorted to in carrying it out, is not actionable. On the part of *Bacher* and the insurance company it is claimed that the detective agency was employed to shadow the plaintiff because it was believed he had given false testimony in the case mentioned, and they were waiting for the outcome of the pending motion for a new trial, when they would determine whether they would apply for plaintiff's arrest upon a charge of perjury, and

that in the meantime plaintiff might leave town, and this last they intended to prevent or to keep themselves informed of. They denied positively and categorically all combination for any purpose other than that above mentioned. On the part of *Gordon* and *Paczkowski* it is claimed they were employed to follow and watch, in other words to shadow the plaintiff, and that it was left to *Gordon* to decide whether this shadowing should be open or secret, that he selected the rough or open method as most effective to prevent plaintiff leaving town, and beyond this *Gordon* and *Paczkowski* deny all charges of threats, eavesdropping, or other improper conduct, but apparently make the broad claim that when employed to do so they may rough-shadow any person with impunity. The defendants other than *Gordon* and *Paczkowski* had knowledge that the process called open or rough shadowing was to be employed or was being employed and consented to it. There is some claim made that these other defendants did not know what rough or open shadowing meant, but it was their duty to know before they entered into a combination to carry it out or before they countenanced it. It is not the law that one may enter into a combination to "maroon" or to "burke" a man and afterward go free on the ground that he did not know what was meant by these unusual words. In any event, whether they knew or not was a question for the jury.

Omitting for the present all alleged acts of trespass or eavesdropping and all alleged threats and slanderous words and all alleged restraint of plaintiff's liberty, is any personal right violated by openly and publicly following and watching one? To publish of and concerning a person words, pictures, or signs which have a tendency to bring that person into public disrepute or into public ridicule, contempt, and disesteem is an actionable wrong to his reputation. *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268; *Moley v. Barager,* 77 Wis. 43, 45 N. W. 1082; *Solverson v. Peterson,* 64 Wis. 198, 25 N. W.

14; *Wandt v. Hearst's Chicago American,* 129 Wis. 419, 109 N. W. 70. It can scarcely be doubted that the publication of a cartoon showing the plaintiff followed and watched by detectives, who pursue and watch him by day and stand guard on the sidewalk in front of his house at night, would, within the principle of the foregoing cases, be an actionable libel— an injury to plaintiff's reputation. How then can it be said that the acts which the picture represents, accompanied with equal publicity, do not constitute an injury to reputation? Can we say they are actionable when represented by picture but nonactionable when actually committed? It must be conceded that to publicly proclaim one suspect, to publicly charge that he deserves watching and that he is being followed and watched, does subject him to public disrepute, ridicule, and contempt. If so, the acts here complained of are the analogue of libel except the writing, printing, and passing around. But these elements are supplied by the public, notorious, and continued character of the surveillance. We must hold that rough or open shadowing as here described and defined is an unlawful act resulting in legal injury to the reputation of the person who is the object of such attentions. Actual pursuit and public surveillance of person and home are suggestive of criminality fatal to public esteem and productive of public contempt or ridicule. So, without taking up the question of secret surveillance, which is not before us, we are impelled to hold that on this ground a case was made for the jury. A conspiracy to libel the plaintiff or to commit any other wrong to his person, reputation, or property may, when damage follows, be the subject of a civil action. *White v. White,* 140 Wis. 538, 122 N. W. 1051; *Jones v. Monson,* 137 Wis. 478, 119 N. W. 179; *Fisher v. Schuri,* 73 Wis. 370, 41 N. W. 527; *Smith v. Nippert,* 76 Wis. 86, 44 N. W. 846.

There is in this case also testimony tending to show, and which, if believed by the jury, would show, circumstances of

aggravation, consisting of accusations, threats, trespass, eaves-
dropping, insults, and ambiguous and uncalled-for communi-
cations with plaintiff's employer. The defendants so far
misconceive the plaintiff's rights and their power as to seek
to justify their entry or entries into plaintiff's house, and
their pursuit of him even into his attorney's office, upon the
ground that in the one case they wished to identify the plaint-
iff and in the other to keep him in sight, and aver that their
conduct was civil and proper on each occasion. They knew
they were uninvited and unwelcome, that they were adversary
to the plaintiff, and they cannot justify the invasion of his
home or the pursuit of the plaintiff into his attorney's office
upon any such grounds. Neither place was public or open
to the defendants. Each place was a sanctuary to the plaint-
iff as against his legally unauthorized pursuers. The defend-
ants present this case as if their evidence relating to the pur-
pose of the surveillance was conclusive upon the court below
and the jury. Not so. The plaintiff may show by circum-
stantial or other evidence that the purpose claimed by defend-
ants was not their true purpose, even in a case where the pur-
pose claimed by defendants is a lawful purpose. In the in-
stant case it is difficult to see how the acts testified to on the
part of plaintiff could have the effect of inducing him to re-
main in town. Making it unpleasant for a man may have
the effect of keeping him in town, but the jury would have
the right to draw the opposite conclusion as to whether the
acts took place, as to their effect, and as to the real intention
of defendants. The plaintiff testified that one of the detect-
ives told him to get out of town. The jury would have been
justified in finding from the evidence, notwithstanding the
positive testimony of defendants with reference to their pur-
pose, that it was the intention of the defendants to drive the
plaintiff out of town.

It is argued that neither the detective agency nor Heyer
are made parties defendant, hence that the plaintiff has not

the right to complain of unlawful actions on the part of Heyer. But the liability of conspirators to civil damages is joint and several, and, a conspiracy being shown *prima facie,* the plaintiff may give in evidence the acts and sayings of any conspirator done or said in furtherance of the common purpose, whether that conspirator be a party defendant or not. 8 Cyc. 659, 660, 680 and cases in note 76. It is argued that the defendant *Gordon* was not master of *Paczkowski* or Heyer, but was like them an employee of the detective agency, and that the insurance company and *Bacher* were not responsible for excess of zeal or excess of authority on the part of Heyer or *Paczkowski.* This is also an erroneous view of the law. When persons are charged as conspirators and a *prima facie* case of conspiracy is shown, the acts and sayings of each conspirator, whether a defendant or not, in furtherance of the unlawful conspiracy, is evidence against his coconspirator, not under the rule *respondeat superior,* but under that rule of the conspiracy law which makes each the agent and spokesman of all in the unlawful enterprise. The plaintiff in a suit for civil damages caused by conspiracy may invoke, for the purpose of connecting any person with the tort, either the rule *respondeat superior* or the rule above stated relative to the acts and admissions of conspirators, and this is so elementary as not to require the citation of authority in its support. In this case there is evidence tending to hold the defendants *Gordon* and *Bacher* under the conspiracy rule, and the defendant insurance company under this same rule as well as under the rule *respondeat superior.* *Daley v. C. & N. W. R. Co.* 145 Wis. 249, 129 N. W. 1062, and cases cited.

Passing from detail to a larger view of the evidence for the defense. Defendants attempt to justify by stating that their purpose was to prevent plaintiff leaving town until they had determined whether or not to have him arrested. This in itself is not a lawful purpose. The defendants are not public officers. So far as the enforcement of the criminal laws is

concerned they have no duties except those common to all private citizens. A statute of this state provides:

"Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished," etc. Sec. 4466a, Stats.

Preventing or hindering one from leaving town is preventing or hindering him from doing or performing a lawful act. Whether or not this last is maliciously done is a question for the jury. If this criminal statute has been violated to the damage of the plaintiff, a cause of action accrued to him from such violation. *Randall v. Lonstorf*, 126 Wis. 147, 105 N. W. 663, 3 L. R. A. N. s. 470, note.

The testimony given by the defendants, while not constituting a defense, is however competent in mitigation of damages. If they can satisfy the jury that their intentions were' good, that they lacked malice, that they mistakenly thought they were performing a legal duty, or that the plaintiff's reputation was so bad that the wrongful acts of the defendants were not likely to injure him in any degree or in any great degree, all this may be taken into consideration in mitigation of damages; but so long as the law is just and impartial we cannot accept the testimony of the defendants here as justification, unless we are ready to concede that any person or corporation may employ private detectives for the purpose of openly and continuously following and watching another person, and any private detectives in pursuance of such employment may openly and publicly follow and watch a man and commit the acts which the evidence here tends to show were committed. It is hardly necessary to say that this extraordinary privilege is not possessed by any private person at

common law, and, as we have seen, the attempted exercise thereof constitutes a legal injury to reputation.

The learned counsel for respondents calls the plaintiff a "self-confessed perjurer, drunkard, and convict," and argues that his testimony is not entitled to credence. We cannot so easily dispose of the case. In the first place the right of action does not rest solely upon plaintiff's testimony; second, the question of credibility of the plaintiff is for the jury; and third, we have in this state a government of law, and there is none so lowly and weak as to be beneath its protection and none so high and powerful as to be above its restraints.

The judgment in this case must be reversed because of the error of the learned circuit court in directing a verdict for defendants, and we take occasion to say that the court below was unduly technical in the exclusion of evidence. The plaintiff was denied the privilege, on examination of the defendant *Gordon* as an adverse witness, of inquiring whether or not he had anything to do with the garnishment of plaintiff's wages; denied the right to ask this witness what effect he intended to produce upon the plaintiff by open shadowing; denied the right to ask whether there was a warrant issued for plaintiff in the alleged contemplated perjury prosecution; denied the right to show by the witness Foster that *Schultz* and his wife were greatly agitated; denied the right to show by the same witness that the appearance of the detectives when remonstrated with was overbearing; denied the right to show by the same witness whether the neighbors of *Schultz* made complaint to him about the presence of the detectives; denied the right to show that the neighbors talked to Foster about the presence of the detectives; struck out the statement of Foster that in the struggle between Rubin and the detective in the hall the detective proved the stronger man; denied the right to prove that the police officer applied to for protection stated in the presence of *Gordon* that he could not arrest the detectives without a warrant; struck out the statement of

the witness Polazik that the plaintiff "was arrested pretty near;" struck out the statement of the witness Pinkalski that after his first conversation with the detectives he did not talk any more because he was afraid somebody would get killed; struck out the statement of Robanski that the plaintiff was afraid, was scared when informed by Robanski what the detectives said to the latter about somebody disappearing; struck out the statement of the plaintiff that when the detective came into his house at 8 o'clock in the evening plaintiff's wife and four children were present; also the statement of the plaintiff that the detectives kept hounding him all the time; also sustained an objection to a question put to *Bacher* as an adverse witness asking whether the shadowing or some part of it was with his approval and consent.

Conclusions of fact are not always inadmissible, and so far as they relate to collateral facts not directly in issue, save much delay and circumlocution. The same is true of leading questions. Ordinary conversation and ordinary writings abound in conclusions of fact. Most of these are permissible in testimony. To refuse to permit a witness to testify that one appeared "frightened" or "insolent" or "overbearing" or "enraged" has the effect merely of shutting out the testimony of all eye-witnesses of these conditions who have not extraordinary powers of description. Cross-examination will in all such cases sufficiently disclose what bases the witness has for his conclusion. It is hoped that these errors will not be repeated.

*By the Court.*—Judgment reversed, and the cause remanded for a new trial.