Argued January 8, affirmed April 1, 1975

McLAIN, *Appellant, v.* BOISE CASCADE
CORPORATION ET AL, *Respondents.*

533 P2d 343

*Raymond J. Conboy,* Portland, argued the cause for appellant. With him on the brief were Garry Kahn and Pozzi, Wilson & Atchison.

*Bruce Williams,* Salem, argued the cause and filed a brief for respondent Boise Cascade Corporation.

*Donald A. Loomis,* Eugene, argued the cause and filed a brief for respondent United Diversified Services, Inc.

Before McALLISTER, Presiding Justice, and DENECKE, HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

McALLISTER, J.

This is a damage action in which plaintiff alleged two causes of action, one for invasion of privacy and one for civil trespass. Plaintiff demanded general and punitive damages for invasion of privacy and nominal and punitive damages for trespass. The trial court granted an involuntary nonsuit of the privacy cause of action and submitted the trespass claim to the jury after withdrawing from their consideration the claim for punitive damages. The jury returned a verdict for plaintiff for $250, being the amount prayed for as nominal damages. Plaintiff appeals. We affirm.

Plaintiff was employed by Boise Cascade Corporation as a glue mixer. On May 19, 1972 he strained his back when he fell while carrying a 100 pound sack of flour to a glue machine. Plaintiff was taken to the office of Dr. D. H. Searing in Salem. Dr. Searing sent plaintiff to the hospital where he was placed in traction. On June 6, 1972, Dr. Searing wrote to Richard Cyphert, then in charge of the Boise Cascade Workmen's Compensation program, advising that plaintiff might be disabled for as much as 12 months. Dr. John D. White was called in as a consultant. He performed a myelogram on plaintiff and reported to Mr. Cyphert that he found no evidence of nerve root or lumbar disc disease and that it was possible that plaintiff was "consciously malingering". Cyphert received this letter on June 22, 1972.

On the basis of Dr. White's report Mr. Cyphert notified plaintiff his compensation payments would be terminated. At about that time Mr. Cyphert also was informed that plaintiff was performing part-time work for a mortuary while he was ostensibly disabled. On June 27, 1972 plaintiff received a written release from

Dr. White permitting him to return to work with the restriction that he was not to lift more than 50 pounds. Plaintiff returned to work and was assigned an easier job, but was unable to work due to continued pain in his hip.

Plaintiff then consulted an attorney, who filed a request for a hearing with the Workmen's Compensation Board asking that plaintiff's temporary disability payments be reinstated. Mr. Cyphert received a copy of this request on July 5, 1972. On July 12, 1972 Mr. Cyphert hired the defendant United Diversified Services, Inc., to conduct a surveillance of the plaintiff to check the validity of plaintiff's claim of injury. United assigned two of its employees, Rick Oulette and Steve Collette, to conduct a surveillance. The two investigators took 18 rolls of movie film of plaintiff while he was engaged in various activities on his property outside his home. Some of the film showed plaintiff mowing his lawn, rototilling his garden and fishing from a bridge near his home.

Plaintiff lived at Independence on a large square lot containing slightly more than two acres. The property is bounded on the north by the Hopville Road, on the east by a pond, on the west by property owned by Lindsey Ward, a neighbor. To the south is a field which apparently also belongs to Mr. Ward.

Some of the film of plaintiff was taken from a barn behind plaintiff's house, which apparently belonged to Ward, although the record is not clear on that point. Other film was taken by Collette while plaintiff was fishing from a bridge on the Hopville Road near the northeast corner of plaintiff's property. The record is not clear as to where Mr. Collette was standing while taking that film. The remaining rolls of film were

taken by Mr. Collette from a point near some walnut trees at the southeast corner of plaintiff's property.

There was a barbed wire fence a short distance west of the east boundary of plaintiff's tract and west of the row of walnut trees from which some of the film was taken. Collette testified that he stayed east of the fence and did not know that he was on plaintiff's land. He testified, however, that he crossed over a fence under the bridge near the northeast corner of plaintiff's property in order to get to his vantage point near the walnut trees. He probably trespassed on plaintiff's property when he crossed the fence, but that does not appear clearly from the record.

On one occasion while Collette was near the walnut trees he was seen by plaintiff. When Collette realized he had been seen he left the area. He had parked his pickup truck on Ward's property near the southwest corner of plaintiff's tract, but abandoned the pickup when he was spotted by McLain and retrieved his truck later.

McLain did not learn about the film and picture taking until the film was shown at the Workmen's Compensation Hearing.

United's investigators did not question any of plaintiff's neighbors or friends and limited their activities to taking pictures while plaintiff was engaged in various activities outside his home. Plaintiff testified that these activities could have been viewed either by neighbors or passersby on the highway. Plaintiff further testified that he was not embarrassed or upset by anything that appeared in the films. He said:

"Q   You did all of the things that were shown in the film? There was no deception in the film?

"A   No.

"Q  You agree that what you saw there was what you did?

"A  Right.

"Q  And you weren't embarrassed by it or mad or upset?

"A  No, the only thing I was mad about was the fact they snuck around behind my back.

"Q  The thing that really bothered you was that somebody filmed you without telling you, isn't that right?

"A  Right.

"Q  Other than that, it just made you mad that somebody did that without telling you? Other than that, that is all there was to it?

"A  Right. And I didn't think anybody had any right on my property without permission."

■ It is now well established in Oregon that damages may be recovered for violation of privacy. *French v. Safeway Stores,* 247 Or 554, 430 P2d 1021 (1967); *Tollefson v. Price,* 247 Or 398, 430 P2d 990, 33 ALR3d 149 (1967); *Hinnish v. Meier & Frank Co.,* 166 Or 482, 113 P2d 438, 138 ALR 1 (1941).

The general rule permitting recovery for such intrusion is stated in Restatement of the Law of Torts 2d, § 652B (Tent. Draft No. 13, 1967) as follows:

"One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man."

See, also, Prosser, Torts (4th ed 1971), 807; Prosser, *Privacy,* 48 Cal L Rev 383, 389 (1960).

■ It is also well established that one who seeks

to recover damages for alleged injuries must expect that his claim will be investigated and he waives his right of privacy to the extent of a reasonable investigation. *Tucker v. American Employers' Ins. Co.,* 171 S2d 437, 13 ALR3d 1020 (Fla App, 1965); *Souder v. Pendleton Detectives, Inc.,* 88 S2d 716 (La App 1956); *Forster v. Manchester,* 410 Pa 192, 189 A2d 147, 150 (1963); *Ellenberg v. Pinkerton's, Inc.,* 125 Ga App 648, 188 SE2d 911 (1972). We quote from the Annotation, Right of Privacy—Surveillance, 13 ALR3d 1025, 1027:

> "Where the surveillance, shadowing, and trailing is conducted in a reasonable manner, it has been held that owing to the social utility of exposing fraudulent claims and because of the fact that some sort of investigation is necessary to uncover fictitious injuries, an unobtrusive investigation, even though inadvertently made apparent to the person being investigated, does not constitute an actionable invasion of his privacy."

In *Forster v. Manchester,* supra, 189 A2d at 150, the court stated:

> "It is not uncommon for defendants in accident cases to employ investigators to check on the validity of claims against them. Thus, by making a claim for personal injuries, appellant must expect reasonable inquiry and investigation to be made of her claim and to this extent her interest in privacy is circumscribed. * * *"

■ If the surveillance is conducted in a reasonable and unobtrusive manner the defendant will incur no liability for invasion of privacy. *Tucker v. American Employers' Ins. Co.,* supra; *Forster v. Manchester,* supra; *Souder v. Pendleton Detectives, Inc.,* supra.

On the other hand, if the surveillance is conducted in an unreasonable and obtrusive manner the defendant will be liable for invasion of privacy. *Pinker-*

*ton National Detective Agency, Inc. v. Stevens,* 108 Ga App 159, 132 SE2d 119 (1963); *Souder v. Pendleton Detectives, Inc.,* supra; *Schultz v. Frankfort Marine Accident and Plate Glass Insurance Co.,* 151 Wis 537, 139 NW 386 (1913).

■ In this case we think the court below properly granted a nonsuit for the cause of action for invasion of privacy. In the first place, the surveillance and picture taking were done in such an unobtrusive manner that plaintiff was not aware that he was being watched and filmed. In the second place, plaintiff conceded that his activities which were filmed could have been observed by his neighbors or passersby on the road running in front of his property. Undoubtedly the investigators trespassed on plaintiff's land while watching and taking pictures of him, but it is also clear that the trespass was on the periphery of plaintiff's property and did not constitute an unreasonable surveillance "highly offensive to a reasonable man".

■ Plaintiff does not contend that the surveillance in this case was per se actionable. Plaintiff contends only that the surveillance became actionable when the investigators trespassed on plaintiff's property. Plaintiff's brief states the issue as follows:

> "The issue before this Court is whether trespass upon another's homestead for the purpose of conducting an unauthorized surveillance gives rise to an action for violation of the right of privacy, * * *"

We think trespass is only one factor to be considered in determining whether the surveillance was unreasonable. Trespass to peer in windows and to annoy or harass the occupant may be unreasonable. Trespass alone cannot automatically change an otherwise reasonable surveillance into an unreasonable one. The one

trespass which was observed by plaintiff did not alert him to the fact that he was being watched or that his activities were being filmed. The record is clear that the trespass was confined to a narrow strip along the east boundary of plaintiff's property. All the surveillance in this case was done during daylight hours and when plaintiff was exposed to public view by his neighbors and passersby.

■ By the same reasoning we think the court did not err in striking the claim for punitive damages in the cause of action for trespass. Assuming that the trespass in this case was intentional there was no evidence of intent to harm, harass or annoy the plaintiff. The surveillance took place near the boundaries of plaintiff's property. The trespass was unlawful, but did not injure plaintiff, nor was it intended to injure him. We think the court properly withdrew from consideration by the jury the claim for punitive damages on account of trespass.

The judgment is affirmed.

TONGUE, J., concurring.

I concur in the result because of the insufficiency and uncertainty of the evidence relating to the nature and extent of any alleged trespass upon plaintiff's property.