KISTLER, S. J., dissenting.
In this case, defendants put out their garbage for collection and disposal, as they ordinarily did. A garbage company employee, at the request of the police, picked up defendants' garbage bin separately and turned the closed bin over to the police, who opened and examined it. In an earlier case, State v. Howard/Dawson , 342 Or. 635, 642-43, 157 P.3d 1189 (2007), we recognized that "when a person gives up all rights to control the disposition of property, that person also gives up his or her privacy interest in the property in the same way that he or she would if the property had been abandoned." Id. at 642-43, 157 P.3d 1189. In so holding, we did no more than extend our earlier decision in State v. Purvis , 249 Or. 404, 438 P.2d 1002 (1968). This court held that an examination of the defendants' garbage in both Purvis and Howard/Dawson did not violate any privacy interests protected by Article I, section 9. Today, the majority overrules Purvis , **783 and Howard/Dawson to the extent it relied on Purvis , and it adopts a position that is at odds with that of most courts across the country. I respectfully dissent.
Ordinarily, a person who gives up all possessory interests in property retains no privacy interest in it. The majority, however, seeks to avoid that established principle in one of two ways. First the majority focuses on the privacy interest that defendants had in their garbage before it was collected. State v. Lien/Wilverding , 364 Or. 750, 766-67, 441 P.3d 185 (2019). This case, however, involves the examination of garbage after it was collected-a quite different issue. On that issue, the majority does not appear to call into question or overrule Howard/Dawson 's holding that the lack of any possessory interest in property necessarily defeats a privacy interest in it. Second, the majority emphasizes that the garbage collector was acting as a police agent when he collected defendants' garbage. 364 Or. at 780, 441 P.3d at 194-95. In considering the latter point, the majority's reasoning conflates two questions that should be kept separate. The first is whether a private individual was acting as a government agent, which determines whether the restrictions of Article I, section 9, apply to a private individual's actions at all. The second question is whether the garbage collector's status as a police agent prevented defendants' possessory and ownership interests, along with any privacy interests, from being extinguished when their garbage was collected.
On the question of defendants' privacy interests in their curbside garbage, the majority travels from Portland to Salem by way of Maine. Largely absent from that analysis are this court's two prior cases on privacy interests in garbage, Howard/Dawson and Purvis , 249 Or. at 411, 438 P.2d 1002, and the concept of abandoned property, upon which both turned. Instead, the majority focuses on a right to privacy derived from the cluster of torts that are often referred to as invasion of privacy. 364 Or. at 762, 441 P.3d at 192. But that conception of privacy is inapposite to that protected by Article I, section 9.
We have recognized that
"[f]our separate theories comprise the 'umbrella' tort referred to as invasion of privacy: (1) intrusion upon seclusion;
**784 (2) appropriation of another's name or likeness; (3) false light; and (4) publication of private facts."
Mauri v. Smith , 324 Or. 476, 482, 929 P.2d 307 (1996). The latter three theories speak to different interests than those protected by Article I, section 9. All concern publicity and disclosure-but whether something is a search under Article I, section 9, never depends on who the government tells about *204 what it finds. And the torts of false light and publication of private facts provide protections regarding certain types of private or embarrassing information, yet "[t]he constitutional provisions against unreasonable searches and seizures do not protect a right to keep any information, no matter how hidden or 'private,' secret from the government." State v. Campbell , 306 Or. 157, 166, 759 P.2d 1040 (1988).
The tort of intrusion upon seclusion is focused more on private places than private information and thus applies in more conventional search contexts. See Mauri , 324 Or. at 485, 929 P.2d 307 ; McLain v. Boise Cascade Corp ., 271 Or. 549, 533 P.2d 343 (1975). But if that tort started from similar premises, it has developed differently enough from our Article I, section 9, jurisprudence that it is not much help in articulating the latter. The tort requires intrusion into "private areas or concerns" and that
"the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object."
Restatement (Second) of Torts § 652B comment d (1977). That suggests the adoption of a "reasonable expectation of privacy" standard-albeit a fairly stringent one. Yet we have expressly rejected using a reasonable expectation of privacy test to determine the privacy protected by Article I, section 9. As we explained in Campbell :
"The phrase becomes a formula for expressing a conclusion rather than a starting point for analysis, masking the various substantive considerations that are the real bases on which Fourth Amendment searches are defined. * * * Moreover, the privacy protected by Article I, section 9, is **785 not the privacy that one reasonably expects but the privacy to which one has a right ."
306 Or. at 164, 759 P.2d 1040. Although the reasonable expectation of privacy test remains popular in other jurisdictions, the grass looks no greener on the other side than it did at the time of Campbell .
In any event, intrusion upon seclusion case law is unlikely to be much aid. In McLain , 271 Or. 549, 533 P.2d 343, this court held that trespassing onto the plaintiff's property in order to photograph him was not sufficient to make out a tort claim in part because the plaintiff had made a workers compensation claim and thereby "waive[d] his right of privacy to the extent of a reasonable investigation," id . at 555, 533 P.2d 343, the surveillance was "done in such an unobtrusive manner that plaintiff was not aware that he was being watched and filmed," id . at 556, 533 P.2d 343, and "there was no evidence of intent to harm, harass or annoy the plaintiff," id . at 557, 533 P.2d 343. As that reasoning highlights, our limited intrusion upon seclusion jurisprudence does not draw a distinction between the question of whether a search occurred and whether that search was reasonable-both are collapsed into a single step and analyzed in a balancing inquiry. Factors such as whether the plaintiff was aware that he was being watched and the intent of the individual performing the search, properly irrelevant in the Article I, section 9, context, are given substantial weight. In other words, it does not seem that we can learn much from our invasion of privacy law, unless we wish radically to rethink our Article I, section 9, jurisprudence.
Fortunately, the majority does not take that approach; its reliance on the privacy torts seems largely figurative.[1] But not much is left in its place. Some cursory testimony by witnesses in this case and a single newspaper article are taken to suggest social norms for the whole state. An analysis of whether defendants expected or expressly authorized **786 examination of their trash by law enforcement suffices to establish a legal norm *205 against examination of trash by law enforcement. The decision is driven more by judicial intuition than precedent or objective indicia.
In any event, to the extent that the question in this case is whether there is a privacy interest in garbage placed for collection at the curb, which is the only question that the majority expressly answers, then that question could be resolved on much more straightforward grounds. We recognized in Howard/Dawson that, in this context, privacy interests are largely coextensive with ownership and possessory interests. As we held in that case, "when defendants turned the garbage over to the sanitation company without any restriction on its disposition, they effectively abandoned that property * * *." Howard/Dawson , 342 Or. at 642, 157 P.3d 1189. This case is decided on the assumption that defendants maintained possessory interests in their garbage until it was picked up by the garbage collector-as long as the garbage was still on the curb, it was not abandoned. --- Or. at ----, --- P.3d at ----. In State v. Smith , while not limiting searches to physical trespasses, this court held that "the privacy interests that are protected by Article I, section 9, commonly are circumscribed by the space in which they exist and, more particularly, by the barriers to public entry (physical and sensory) that define that private space." 327 Or. at 373, 963 P.2d 642. Defendants' garbage was contained within a cart, and within that most of it was contained in opaque bags. Nor is there any other factor that would diminish that interest, such as the placement of that property in a communal or public place. The cart was either on or directly adjacent to defendants' property. Given that defendants held a possessory right to their garbage, that it was placed next to their property, and that any examination would require penetration of the "barriers to public entry" surrounding the garbage, I have no difficulty concluding that defendants possessed a privacy interest in the garbage that they placed at the curb.
Of course, that is not the question in this case. No search occurred while defendants' garbage was placed at the curb. Instead, the garbage was collected by Republic **787 Services, which then turned the garbage over to the police, who then opened the bin and bags. The appropriate question, therefore, is whether defendants retained a privacy interest in garbage once it was collected-that is, once they forever gave up any right to control its disposition. That is the question that we answered in the negative in Howard/Dawson . Defendants may have expected, however reasonably, that once their garbage was collected it would be quickly mixed with other garbage and taken forthwith to a landfill. But, as they completely and forever gave up control of that property, none of those expectations translated into the "privacy to which one has a right ," Campbell , 306 Or. at 164, 759 P.2d 1040, protected by Article I, section 9.[2] See Howard/Dawson , 342 Or. at 643, 157 P.3d 1189. The garbage collection company, at that point the rightful owner of the garbage, could, at will, decline to mix it, unmix it, have its own employees comb it for contraband, or hand the garbage over to the police. Investing such totally abandoned property with constitutional privacy rights would amount to a restriction upon the new owner-a denial of his right to authorize searches by the state. It should not be doubted that that right is valuable to many. The ability to consent to a search can, in some contexts, be a tool to prove one's innocence. And individuals often have reasonable desires to use their property to help the police conduct investigations. Republic understandably may be opposed to the use of its collection system to hide evidence of drug activity.
To be sure, we have recognized, in two cases involving bailments, State v. Barnthouse , 360 Or. 403, 380 P.3d 952 (2016), and State v. Sholedice/Smith , 364 Or. 146, 163, 431 P.3d 386 (2018), adh'd to as modified on recons. , 364 Or. 575, 437 P.3d 1142 (2019), that giving away immediate possession of an object does not trigger the loss of Article I, section 9, protections entirely. But in those cases, the defendants retained some possessory and ownership interests in the objects in question-defined by contractual rights that *206 bound the bailee-and those retained interests were interfered with. In that regard, they are of a piece with Howard/Dawson 's holding that "the legal **788 relationship between defendants and the sanitation company effectively controls the question whether defendants retained a constitutionally protected privacy interest in the garbage." Howard/Dawson , 342 Or. at 642, 157 P.3d 1189. Overruling that holding, and expanding Article I, section 9, protections to abandoned property controlled without restriction by third parties, would raise complex questions of competing rights that the majority does not purport to resolve.
As a result, I do not understand the majority to take issue with the general proposition that once garbage is picked up, the garbage collection company, at that point the rightful owner of the garbage, can decline to mix it with other garbage, can gift it to the police, and can consent to any search of the contents. There would be no constitutional violation, that is, were police officers to approach the garbage collector, immediately after the trash was picked up but before it was mixed in with the rest, and at that point to conduct an examination of the garbage with the permission of its new owner.
That is where the second branch of the majority's analysis comes into play. The majority reasons that
"common law agency principles now require us to view the police officers in Howard/Dawson as the principals who, through use of their agent, were vicariously responsible for segregating and procuring the contents of defendants' garbage bin for exposure to police search, thereby invading defendants' privacy rights without a warrant."
364 Or. at 769, 441 P.3d at 195. In effect, the majority concludes that our decision in State v. Sines , 359 Or. 41, 379 P.3d 502 (2016), requires the court to view this fact pattern as though the police themselves had collected defendants' garbage.
I agree that the garbage collector was acting as a police agent when he collected defendants' garbage, but I do not believe that that conclusion holds much significance for this case. The majority suggests that the garbage collector's status as a government agent turned his otherwise-permitted removal and transfer of defendants' trash into a search, but **789 does not spell out how. The majority reasons that it cannot be said
"that the police obtained the sanitation company's consent to go through defendants' garbage once the sanitation company, as usual, had picked it up with its mechanized garbage truck."
--- Or. at ----, --- P.3d at ----. But most of that can and must be said-Republic did, as usual, pick up defendant's garbage, and then gave the police permission to search it. True, the collection was not accomplished through use of a mechanized ruck, but the majority offers no reason why that fact has constitutional significance. The majority does not contend that there is general constitutional privacy interest in the type of truck in which garbage is collected or in having one's garbage mixed. And Republic was not contractually obligated to mix defendants' garbage or to collect it in a specific type of vehicle. The record reveals that Republic used a large, mechanized truck for reasons of efficiency, not because that was how it agreed to provide collection services to its customers.[3]
The majority's point, as I understand it, is that the police officers' use of the garbage collector as an agent effectively negated defendants' agreement with the collector, at least for constitutional purposes. The majority errs by relying on Sines to reach that conclusion. In Sines , looking to common law agency principles, we set out a test governing when a private individual acts as a government agent, for the purpose of determining *207 whether Article I, section 9, applies to the private actor's actions at all. Id. at 55, 379 P.3d 502. In Sines , that threshold question proved dispositive; we ultimately concluded that the private actor in question was not acting as a government agent, and consequently that none of her actions could implicate Article I, section 9. **790 359 Or. at 62, 379 P.3d 502. Thus, Sines never considered the question of how the private actor's status as an agent would affect the subsequent analysis of whether her actions violated a possessory or privacy interest and thereby constituted a seizure or a search.[4]
Sines therefore offers no reason to conclude that the garbage collector's status as a government agent should affect the analysis of whether his actions interfered with defendants' possessory or privacy interests. There can be no dispute that if the garbage collector had not been acting as a government agent, he would have violated no possessory or ownership interest in collecting defendants' garbage. And, once he did so, any possessory, ownership, or privacy interests that defendants once had in their garbage were abandoned. The majority suggests, though, that the garbage collector's status as a police agent made the fact that defendants had left their property to him irrelevant to the evaluation of whether defendants' possessory or privacy interests were violated. More important, the majority suggests, is the fact that the police would have committed a seizure had they taken the garbage directly. --- Or. at ----, --- P.3d at ----. The common law agency principles that this court relied upon in Sines do not point in that direction. If the garbage collector had violated any possessory or privacy interest of defendants, while acting as a police agent, then that violation would appropriately be attributed to the state. But here, the state's agent obtained defendants' trash without any violation of possessory or privacy interests (or fraud, or trespass, or damages caused, or any other illegality) so there is no wrong to attribute to the state. Put another way, an agent does not forfeit her own rights merely because she acts on behalf of a principal. Many agency relationships arise precisely because the agent can do something that the principal cannot-and that the principal may be legally prohibited from doing. A lawyer is not forbidden from practicing law because his client is not a member of **791 the bar; a trucker is not prohibited from driving a semi-trailer because her employer lacks a commercial driver's license.
Establishing that an agent is bound by her own limitations, not her principal's, is a long way from holding that the state can use private agents to evade the strictures of Article I, section 9. As in all cases, the appropriate course is to examine whether the agent's actions violated a privacy or possessory interest. In general, that will not occur if the agent takes property or accesses places in a manner that the suspect has authorized, but typically will occur if the scope of that permission is exceeded.
"A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials; * * *."
Lewis v. United States , 385 U.S. 206, 211, 87 S. Ct. 424, 17 L.Ed. 2d 312 (1966). Similarly, a maid may enter a hotel room and perform her ordinary cleaning tasks without violating any privacy or possessory interests, even if she does so at the behest of the police, but "[i]f the officer had requested the maids to search for a cigarette without regard to whether it would be removed in the usual course of cleaning the room, a different problem would be presented."
*208 Purvis , 249 Or. at 408, 438 P.2d 1002.[5] And to hold that Republic violated no possessory or privacy interests by collecting defendants' garbage at the usual time, in compliance with its agreement with defendants, would not suggest that Republic could disregard that agreement at the government's behest without committing a seizure.
That approach is in harmony with our recent decisions in State v. Sholedice/Smith and in Barnthouse . In those cases, we examined situations where the defendants mailed **792 packages using the United States Postal Service, and evaluated whether various actions by postal inspectors-who were government employees-constituted seizures. We answered those questions by examining the scope of the defendants' possessory rights with respect to the packages, and whether the inspectors took actions inconsistent with those rights. See Sholedice/Smith , 364 Or. at 160-61, 431 P.3d 386 ; Barnthouse , 360 Or. at 416-19, 380 P.3d 952. In doing so, we necessarily recognized that the postal inspectors had special privileges, including possessory rights, with respect to those packages. For example, in Sholedice/Smith we noted that, under the terms of the bailment as articulated in the Domestic Mail Manual, the postal service's authority to possess the package-while not unlimited-included the right to move the package out of the mail hamper for a quick screening. 364 Or. at 160-61, 431 P.3d 386. Thus, when analyzing fact patterns involving actual government actors-not merely private individuals acting as government agents-we have taken into account the authorizations and privileges held by those actors when evaluating whether the defendants' possessory rights were violated.
Put simply, Sholedice/Smith and Barnthouse teach that a state actor does not violate Article I, section 9, if it acts within the course and scope of its authority in dealing with another's property. That being so, it is difficult to see why we should not take the same course in evaluating whether actions by private actors acting as government agents constitute searches or seizures. There is no clear reason why the analysis of a fact pattern involving a package shipped through FedEx should be very different from one involving the United States Postal Service. To be sure, in any case involving private mail carriers we would first need to answer whether the employees in question were acting as government agents. But, assuming that they were, and that Article I, section 9, applied at all, we should then, as with USPS, examine whether the private carrier's actions violated any of the defendant's possessory or privacy rights, by looking at the term of the contract and other social expectations. In this case, Republic did nothing different than it was authorized to do when it collected defendants' trash and, having collected it, divested defendants of their possessory and privacy interests in their garbage.
**793 Government interference with private contractual arrangements may raise concerns of encroaching state power in ways that the government's direct operation of a postal service may not. But our ordinary approach to determining whether a search or seizure occurred, examining the privacy rights and possessory interests involved and whether they were violated, handily deals with that concern, because we have recognized the centrality of contractual rights to both of those inquiries. Howard/Dawson , 342 Or. at 640-42, 157 P.3d 1189. For that reason, actual violations of contractual rights at the government's behest will generally constitute searches or seizures. It is overly prophylactic, however, to hold unconstitutional all government involvement in private contractual arrangements, even where no actual interference occurs.
Still, this is not a question that lends itself to absolutes in either direction. The fact that a private person is acting as a government agent, and is therefore acting according to a different set of motives, will in some circumstances be relevant to the analysis of whether a possessory or privacy interest was violated. But whether and when that action is a violation depends, as usual, on the nature of the privacy or possessory interest at issue. For example, a government mail carrier may *209 be permitted to open and to inspect packages for some purposes, such as the safety of the carrier's employees, but not for the purposes of criminal investigation. In such cases, the purpose of the search would matter a great deal to whether a possessory or privacy interest was invaded. See Sholedice/Smith , 364 Or. 146, 159, 431 P.3d 386 (recognizing such a distinction); United States v. Souza , 223 F.3d 1197, 1202 (10th Cir. 2000) ("While companies such as UPS have legitimate reasons to search packages independent of any motivation to assist police, * * * there is no evidence that in this instance Denning had a legitimate, independent motivation to open the package, despite her practice of randomly opening packages on other occasions").[6] Further, private **794 parties in certain roles linked to privacy or confidentiality, such as lawyers and doctors, probably would commit violations of privacy or possessory interests merely by performing their usual tasks while secretly acting as an agent of the police. Professional standards and privacy laws may be pertinent in determining when it would violate the constitution for the government to invade those relationships.
But most contractual relationships are not of that sort, and in the majority of cases it will be appropriate to recognize the necessary limitations on one's privacy and possessory interests that come with allowing another person to have access to one's possessions or space. In many cases, including this one, the possessory and privacy interests at issue will not be interfered with by the fact that the actor involved is also working for the police-defendants can point to no respect in which Republic failed to comply with its agreement with them, and they do not argue that they ordinarily retain any rights at all in their garbage after it is collected. It should not be overlooked that this case involves garbage-items characterized by the fact that defendants wanted Republic to take them away permanently. Most possessory and ownership interests are more robust.
How these agency questions are approached will have significance beyond this case. Use of agents to gather information that a police officer could not obtain directly is routine. One common example is a controlled drug buy, where an officer furthers an investigation by recruiting a confidential informant and directing that informant to purchase drugs from a suspected drug dealer. Quite often, that practice involves selecting a prior customer of the dealer as an informant-that prior customer, unlike the officer, may be known to or trusted by the dealer and may therefore be able to obtain an invitation into the dealer's house, or another private space, necessary to complete the transaction.[7]
**795 In Lewis , the Supreme Court held that "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant," 385 U.S. at 211, 87 S.Ct. 424, a statement that we endorsed in State v. Leppanen , 253 Or. 51, 53, 453 P.2d 172 (1969). "You have to tell me if you're a cop" is the demand of a criminal about to slip up, not a principle of constitutional law. Yet if a garbage collector's status as a police agent invalidated defendants' unrestricted transfer of their garbage to the garbage collector, it remains to be seen how *210 controlled buys, and other appropriate uses of police agents, can be distinguished.
With respect to garbage-and any other property that an individual has asked a third party to take away forever without imposing conditions on its use-our constitution's protections will, appropriately, be at a low ebb. For reasons both logical and practical, that conclusion will be difficult to escape, regardless of how this court approaches the government's use of private agents. The majority's approach, however, raises more questions than it answers, both about the nature of privacy interests involved and the implications of an individual's status as a government agent. I fear that this case's most significant consequences will lie elsewhere, in cases involving third-party consent, confidential informants, or cooperating witnesses. As to this case, in the final analysis it is no different from Howard/Dawson . Defendants' garbage was collected as usual, by the company that defendants had authorized to take it, in full compliance with the procedures that they were entitled to expect. Once the garbage had been so collected, defendants gave up any privacy rights that they had. No interest of defendants' was substantially interfered with, so no search or seizure occurred. Therefore, the subsequent examination of the garbage by the police officers did not violate Article I, section 9. I respectfully dissent.

If the question in this case were whether the police committed the tort of intrusion upon seclusion, it would surely be relevant that the examination of defendants' garbage was unobtrusive (indeed, that the police took steps to ensure that defendants would remain unaware of their involvement); that the police conducted the search to enforce the law, not to harass or to annoy; and that defendants no doubt invited some degree of scrutiny, and thereby waived their right to privacy, by engaging in the unlawful delivery of heroin.

Assuming, that is, that the transfer is unconditional. It would be otherwise, of course, if defendants retained some right to control the disposition of their garbage. But they do not argue that they did and there is no evidence that they did.

In fact, the framework for the City of Lebanon's agreement with Republic appears to contemplate that Republic may collect garbage with a pickup truck:
"If a franchisee uses a specially designed, motorized local collection vehicle for transporting solid waste * * * the container portion of such vehicle should be equipped with a cover, adequate to prevent scattering of the load. If any pickup truck or open bed truck is used by a franchisee, the load shall be covered with an adequate cover to prevent scattering of the load"
See Lebanon Municipal Code § 8.16.070.

In Tucker , we held that a tow truck driver acted as a government agent when he looked through the defendant's car (which was lawfully in his possession) at the request of a state trooper. State v. Tucker , 330 Or. 85, 90, 997 P.2d 182 (2000). We subsequently held that the state had not met "its burden of proving the validity of a warrantless search." Id . at 91, 997 P.2d 182. In that case, though, the state did not argue that the tow truck driver was permitted to search the interior of defendant's car, so we did not weigh in on that issue.

I read Purvis to have announced essentially the rule that I would analyze this case under. The majority reads Purvis to have rejected the argument that the maids were acting as agents altogether.

Such a distinction was also recognized in Corngold v. United States , 367 F.2d 1, 5 (9th Cir. 1966), in the context of a search by an airline entrusted with a package:
"It would be difficult to justify any conclusion other than that the TWA employee participated in the search solely to serve the purposes of the government. No doubt both the customs agents and the TWA transportation agent relied upon the inspection clause in TWA's tariff and the act of TWA's agent in cutting open the outside package to furnish technical legal justification for the search. But as we have noted, the TWA employee himself testified that he opened appellant's package only because the government agents asked him to, and there is nothing else in the record which would indicate that the package was in fact opened for any purpose of the carrier * * *."

Cases with that fact pattern-where the informant is a prior customer and the drug transaction takes place in the dealer's residence or another building not open to the general public-are common, although the resulting controlled buy has not always been held sufficient on its own to support a subsequent search warrant. See, e.g. , State v. Spicer , 254 Or. 68, 69-70, 456 P.2d 965 (1969) ; State v. Van Osdol , 290 Or. App. 902, 904, 417 P.3d 488 (2018) ; State v. Marsing , 244 Or. App. 556, 560-61, 260 P.3d 739 (2011) ; State v. Chase , 219 Or. App. 387, 389-90, 182 P.3d 274 (2008) ; State v. Wilson/Helms , 83 Or. App. 616, 622, 733 P.2d 54 (1987).