KISTLER, J.
**148 This case presents two questions. The first is whether a United States Postal Service (USPS) inspector seized a package in violation of the Oregon Constitution when she took the package out of a mail hamper and put it on the floor so that a drug-detection dog could sniff it. The second is whether another postal inspector seized the package when, after the dog had alerted to the package, he took it to the addressee's house and asked for consent to search it. Focusing on the first issue, the trial court ruled that no seizure had occurred because defendants had no constitutionally protected possessory interest in the package while it was in the mail. The Court of Appeals reversed, reasoning that defendants had a constitutionally protected property interest in the package, which the first postal inspector significantly interfered with when she took the package out of the mail hamper. State v. Sholedice , 283 Or. App. 346, 386 P.3d 701 (2017) (per curiam); State v. Smith , 282 Or. App. 208, 384 P.3d 175 (per curiam), on recons , 283 Or. App. 422, 387 P.3d 499 (2017) (per curiam). We allowed the state's petitions for review and now reverse the Court of *388 Appeals decisions and affirm the trial court's judgments.
These consolidated cases involve two defendants, Sholedice and Smith. On May 27, 2014, Sholedice mailed a package from Las Cruces, New Mexico, to Smith in Lincoln City, Oregon. He paid the USPS approximately $63 to mail the package by express mail with a guaranteed delivery date of May 29, 2014. The label on the package was handwritten, addressed to "M. Smith" in Lincoln City, and contained a signature waiver, which meant that the package could be left at the address without the addressee signing for it.
Craig is a federal postal inspector who works at a mail processing facility near the Portland airport. Hampers full of mail come into the processing facility each day, filled with packages destined for various locations throughout Oregon. Pursuant to federal policies, Craig sorts through the hampers looking for prohibited mail-i.e. , mail that contains poison, controlled substances, suspicious powders, bombs, and "injurious objects," such as knives, guns, poisonous insects, and snakes. As she explained and the trial **149 court found, she looks for packages containing prohibited mail "to keep our-our carriers safe."[1]
The USPS has established protocols for determining which packages may contain prohibited materials, and Craig sorted packages based on those protocols. On the morning of May 28, Craig came across Sholedice's package. She noticed that four indicators set out in the USPS protocols were present. First, Sholedice's use of express mail was unusual. Express mail is ordinarily used by businesses; it is not typically used for mailing packages from one person to another. Second, Sholedice paid more than was necessary to send the package. He paid approximately $63 to mail the package from New Mexico to Oregon by express mail when first-class or priority mail could have gotten the package to Oregon in the same amount of time at a fraction of the cost.[2] Third, the label included a signature waiver. Craig testified that most senders use express mail to ensure that the letter or package has been received by having the addressee sign for it. She explained that a sender may waive the signature requirement either because "they don't want [the mail carrier] to have a face to face with [the addressee]" or because they do not want the addressee to know that the package has arrived.[3] Finally, Craig testified that senders who use express mail ordinarily use the addressee's full name rather than an initial and last name, such as "M. Smith."
Not only did Sholedice's package stand out for those reasons, but Craig also knew that Oregon is a source state for exporting marijuana and a destination state for receipt of drug proceeds. For those reasons, she took the package out of the hamper and put it on the floor of the sorting **150 facility along with six other similarly-sized packages, which Craig also took out of the mail, so that Nikko, a trained drug-detection dog, could sniff them. Nikko and his handler did not take part in sorting the packages or in selecting which packages would be put in the "package lineup," nor were they aware of which package had aroused Craig's suspicions. Their role was limited to determining if any packages contained drugs. As the handler testified, the USPS does not have "K-9s, and so they ask mostly local agencies to provide that tool for them to screen mail."[4] *389 Nikko sniffed the seven packages and alerted on the package that Sholedice had sent Smith. At the suppression hearing, Nikko's handler explained that Nikko has been certified every six months to detect four drugs: methamphetamine, marijuana, cocaine, and heroin. He testified that, during 4,000 training and certification searches, Nikko has alerted incorrectly only eight times. After Nikko alerted on defendants' package, a person checked the address in Lincoln City and found that it was listed on a registry for medical marijuana grows.
Later, at the suppression hearing, Craig was asked a hypothetical question. She was asked on cross-examination what she would have done if Nikko had not alerted on the package. She testified that the package would not have continued "in the normal course of the mail." Rather, she "would have done a further investigation on it." When asked on redirect what she meant by "further investigation," Craig explained that "we would try to-try to get ahold of M. Smith or Nathan * * * Sholedice" and "talk to them a little bit about the parcel to get some more information."
Craig was not able to take the package to Lincoln City. She accordingly asked another federal postal inspector, Helton, to deliver the package. Helton testified that, although he does not ordinarily deliver mail, he is authorized, as a postal inspector, to do so. On the way to Lincoln **151 City, Helton contacted a Lincoln City detective to serve as a backup. When Helton delivered the package, both he and the detective were wearing plain clothes. Neither displayed a weapon. No patrol car was parked in view of the house. When they arrived at the address in Lincoln City, Helton walked up to the front door. As he did so, he noticed "the distinct and pungent smell" of marijuana.
When he knocked, Michelle Smith came to the door and stepped outside the house. Helton spoke with her briefly. He told her that he was a federal postal inspector and that his job was to investigate illegal activity with the United States Postal Service. He asked her if she were expecting an express mail package, and she said that she was. He then asked "if Nathan [Sholedice] was at home," and she said that he was.[5] He told her that he was going to be "upfront" with her, that he believed that the parcel contained either controlled substances or money, and he "asked for her permission to open the parcel and to examine the contents of the parcel." She replied, "Yeah." Helton asked if there was money in the parcel, and Smith "nodded her head affirmatively, yes."
Helton then asked to speak with Sholedice. Smith asked Sholedice to come out of the house, and Helton spoke with him separately. Helton told Sholedice that he was a federal postal inspector and that he believed that the package contained contraband or money. He then asked Sholedice for his consent to open the package. Sholedice replied, "Yeah, you can open it if you need to." When Sholedice said that, Helton told Sholedice that he "was asking for his permission to open the parcel and search the contents and that I would not open the parcel if he told me that I could not open it." Sholedice responded, "You're going to open it up eventually anyway. Go ahead." Given that response, Helton opened the package, where he found $15,240 vacuum wrapped in **152 plastic, which in turn was wrapped with duct tape. The money was further wrapped inside clothing.
Helton explained that, throughout their conversation, Smith and Sholedice were pleasant. He described them as "calm, *** not particularly upset or angry," and he thanked them for being reasonable under the circumstances. Based on what he found in the parcel and defendants' answers concerning their medical marijuana grow, Helton asked Smith and Sholedice for consent to search their house. Both Smith and Sholedice said "no," and Helton responded that he "totally understood, [and] that [he] respected *390 their decision to deny consent." At that point, the Lincoln City detective left to apply for a state warrant to search the home.
Later, at the suppression hearing, defendants also asked Helton a hypothetical question: If Sholedice had asked Helton to return the package to him when they first spoke-namely, after Helton knew that Nikko had alerted to the package and that the address in Lincoln City was registered as a medical marijuana grow but before Smith had consented to a search-would Helton have done so? Helton answered "no." He provided a similar answer when asked whether he would have delivered the package to Smith without further investigation. He added that, "[i]f the contents of the parcel would have been found to be innocuous and there was a reasonable explanation for the contents of the parcel, [he] would've delivered the parcel to Ms. Smith, as [he] ha[s] done on other occasions." However, Helton testified that he had reason to believe that the package contained either illegal drugs or drug proceeds before speaking with Smith and Sholedice and for that reason would not have delivered the package unopened.
Following the search of the package, the state charged Sholedice and Smith with unlawfully delivering marijuana for consideration in violation of former ORS 475.860(2) (2013), repealed by Or. Laws 2017, ch. 21, § 126. Before trial, both defendants filed motions to suppress the evidence that Helton had discovered as a result of the search of the package. They argued that Craig unlawfully seized the package when she took it from the hamper and put it **153 in the package lineup for Nikko to sniff, and they sought to suppress the evidence resulting from that seizure. The trial court disagreed, explaining that neither Sholedice nor Smith had a protected possessory interest in the package with which Craig or Helton interfered.
In analyzing that issue, the trial court focused initially on Craig's actions in taking the package out of the mail hamper and putting it in the package lineup. The trial court reasoned that, once Sholedice put the package in the mail, neither Sholedice nor Smith had "a possessory interest in the package as long as it's still within the [guaranteed delivery time]." The court reasoned:
"[T]here was testimony during this proceeding by both employees of the post office, that the mailing of contraband does put postal deliveries or postal employees at risk.
"They have a-there's a reason, if you will, that they engage in this screening-screening of packages for contraband.
"And what they have developed is what the Court would describe as a minimal intrusion on the packages that are going through the transit facility, subjecting them to a-a sniff.
"I agree that the postal inspectors both identified or testified that this package, once it was identified as suspicious, was not going to be returned to the normal stream of mail.
"That if the dog had not alerted or no alert, there would have been further investigation. The dog-however, the dog, in fact, did alert. What happened at that point is rather than obtain a warrant, the-and the package was not further opened or inspected-the package was just then given to law enforcement who drove it down to Lincoln City."[6]
As we read the trial court's factual findings, the court found, consistently with Craig's testimony, that Craig removed the package from the mail hamper because she **154 suspected that it contained "nonmailable" material, and her "reason" for looking for packages containing contraband and other nonmailable material was to keep from putting postal employees at risk.[7] The trial court *391 also found that, once Craig identified the package as suspicious, the package "was not going to be returned to the normal stream of mail" and that, "if the dog had not alerted *** there would have been further investigation." As the trial court observed, however, "the dog, in fact, did alert" and, as a result, Craig gave the package to Helton to deliver to Lincoln City.
Because the trial court found that defendants had no constitutionally protected possessory interest in the package, the court recognized that it did not need to decide whether Nikko's alert established probable cause or whether a federal warrant could have been obtained before the guaranteed delivery time. The court, however, accepted the dog handler's testimony that Nikko's training and experience met the "standards as they're set forth in-[ State v. ] Foster ," 350 Or. 161, 252 P.3d 292 (2011), for determining when a trained drug dog's alert establishes probable cause. Finally, the trial court noted, with apparent agreement, that "the State pointed out in their argument that had the State gone through the efforts to obtain a [federal] warrant [to search the United States mail], since a telephonic [warrant] is not available [in federal court], that it actually would have resulted in a more significant intrusion [than having Helton ask for consent] because the package would not have been delivered on time."[8] Having made those findings, the trial court denied defendants' motions to suppress. Afterwards, both defendants entered conditional guilty pleas.
**155 Each defendant appealed separately, and the Court of Appeals reversed in both cases. Smith , 283 Or. App. at 423, 387 P.3d 499 ; Sholedice , 283 Or. App. at 346, 386 P.3d 701. Following its decision in State v. Barnthouse , 271 Or. App. 312, 350 P.3d 536 (2015), aff'd on other grounds , 360 Or. 403, 380 P.3d 952 (2016), the Court of Appeals held "that, for the purposes of Article I, section 9, of the Oregon Constitution, law enforcement illegally seized [the] package by removing it from the stream of mail and submitting it to a dog sniff." Smith , 283 Or. App. at 423, 387 P.3d 499 (summarizing the Court of Appeals' reasoning in Barnthouse ); see Sholedice , 283 Or. App. at 346, 386 P.3d 701 (same). We allowed the state's petitions for review in these cases to consider whether either Craig or Helton seized defendants' package in violation of Article I, section 9, of the Oregon Constitution.[9]
Article I, section 9, protects citizens from unreasonable "searches" and "seizures" by government officials. Barnthouse , 360 Or. at 413, 380 P.3d 952. A search occurs when the government invades a protected privacy interest while a seizure occurs when the government significantly interferes with a person's possessory or ownership interests in property. Id. ; State v. Owens , 302 Or. 196, 206-07, 729 P.2d 524 (1986). In this case, defendants do not argue that Nikko's sniff of the package constituted a "search" for the purposes of Article I, section 9. Rather, they argue that Craig seized the package when she took it out of the mail hamper and put on the floor for Nikko to sniff. Additionally, they argue that Helton seized the package when he asked Smith and then Sholedice for consent to search the package.
We begin with the question whether Craig seized the package when she put it on the floor for Nikko to sniff. On that question, defendants identify two ways in which Craig's actions significantly interfered with their possessory interest in the package and thus constituted a seizure. They argue initially that taking the package out of the hamper and placing it in the package lineup was sufficient, **156 standing alone, to significantly *392 interfere with their possessory interests in the package. Alternatively, they contend that, because Craig intended to conduct a "further investigation" of the package when she removed it from the mail hamper, regardless of whether Nikko alerted, Craig did not intend to deliver the package unopened by the guaranteed delivery date and thus significantly interfered with their possessory interests in the package.
Before determining whether Craig's actions significantly interfered with defendants' ownership or possessory interests, we first identify what those interests were. See Owens , 302 Or. at 207, 729 P.2d 524. Ordinarily, the question whether a person has an ownership or possessory interest in an object is straightforward. Typically, the two interests are united. However, those interests can be separated when, for example, a property owner leases property to another person or when a property owner gives the property to a bailee to store or transport. In the latter instance, the bailor retains an ownership interest in the property, but the bailee has a right to possess the property consistently with the terms of the bailment. See Samuel Williston, 9 A Treatise on the Law of Contracts § 1030 at 879 (3d ed. 1967) ("The rights, duties, and liabilities of the bailor and the bailee must be determined from the terms of the contract between the parties, whether express or implied.").
In this case, we assume that either Sholedice or Smith owned the contents of the package while it was in transit.[10] Sholedice, however, gave the USPS the package to deliver it to Smith. As a bailee or a common carrier, the USPS had the right to possess the package while it was in transit, and the USPS's and defendants' possessory rights in the package were defined by the USPS's agreement with Sholedice, which is found in the Domestic Mail Manual (DMM). See Barnthouse , 360 Or. at 415, 380 P.3d 952 (relying on the DMM
**157 to determine the defendant's contractual right as a third-party beneficiary of the agreement between the sender and the USPS to have the express mail parcel delivered by the guaranteed delivery date).[11]
In arguing that Craig's actions constituted a seizure, defendants have focused on Craig's interference with their possessory interests in the package while it was in transit, not on any interference with their ownership interests in the package.[12] Specifically, they have argued that, under the DMM, the USPS's authority to possess the package did not permit the sort of inspection that Craig undertook. Alternatively, they argue that the DMM gave them affirmative rights to redirect *393 the delivery or the return of the package while it was in transit. For those reasons, defendants contend, Craig's actions significantly interfered with their possessory interests in the package.
We reach a different conclusion. We first explain why Craig's actions in screening the package were consistent with the terms of the bailment, as defined by the DMM. We then explain why Craig's actions did not interfere with any affirmative rights or possessory interests that the DMM gave defendants while the package was in transit. Finally, **158 we note that defendants have not argued that, even if Craig complied with the terms of the bailment, Article I, section 9, imposed additional limitations on her actions.
Defendants argue that, under the DMM, the USPS's authority to possess the package for the purpose of delivering it to Smith did not extend to detaining it so that Nikko could sniff it. Apparently relying on DMM 113.2.2, Sholedice argues that "postal service rules indicat[e] that express mail will not be inspected." He thus finds in the DMM an "implied commitment by the postal service that it will do only what is needed to achieve delivery of a package." Smith, for her part, recognizes that the USPS may engage in some "screening" of packages but argues that "the inspectors' actions in this case went far beyond the 'screening' that USPS customers would reasonably expect."
We begin with Sholedice's argument, which appears to be based on DMM 113.2.2.[13] That section of the DMM provides:
"Matter closed against postal inspection includes First-Class Mail, Priority Mail, or Express Mail. The USPS may open mail other than First-Class Mail, Priority Mail, or Express Mail."
As the words of DMM 113.2.2 make clear, that section of the DMM reflects long-standing Fourth Amendment cases explaining which classes of mail the USPS may open without a warrant. See United States v. Van Leeuwen , 397 U.S. 249, 250-51, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (describing federal cases). As the Court recognized in Van Leeuwen , the USPS may not open and inspect first-class mail except with a warrant or an exception to the warrant requirement; however, lesser classes of mail may be opened and inspected without a warrant. Id.[14] In this case, Craig did not open defendants' package, and defendants do not argue that Nikko's sniff constituted a search of the package. As a result, DMM 113.2.2 **159 has no application to Craig's actions, and Sholedice does not identify any other provision of the DMM that limited Craig's ability to take defendants' package out of the hamper and put it on the floor so Nikko could sniff it.
Smith's argument is closer to the mark. As noted, she recognizes that the USPS can engage in some screening of the mail it processes, but she argues that Craig's actions went beyond what the DMM permits. We read the DMM differently. Chapter 601 of the DMM defines harmful and hazardous materials that either cannot be mailed at all or only under specific conditions. DMM 601.8.1. Among other things, a person cannot mail poisons, controlled substances, poisonous insects and reptiles, live scorpions except when used for medical research, explosives, acids, highly flammable liquids, gases that are likely to ignite during transport, radioactive material, and alligators over 20 inches in length. DMM 601.8.5 (defining harmful matter that is not mailable); DMM 601.8.6 (defining hazardous matter that is not mailable); see DMM 601.9.3.3 (authorizing shipment of baby alligators under 20 inches); DMM 601.9.3.9 (authorizing shipment of live scorpions for use in medical research but only when appropriately packaged).
In addition to defining what may not be mailed, the DMM provides that "[a] postmaster may take any step reasonable and necessary to protect USPS employees and equipment *394 from potentially dangerous or injurious materials or substances found in the mail." DMM 601.8.13. That regulation gives the USPS the right to take reasonable and necessary steps to ensure that packages placed in the mail do not contain prohibited substances. In that respect, it merely codifies the common law. See Illinois v. Andreas , 463 U.S. 765, 769 n. 1, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (recognizing that "[c]ommon carriers have a common-law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband"). Although the DMM does not define what constitutes "reasonable and necessary" steps, the Court's Fourth Amendment cases define the steps the USPS reasonably can take to ensure that the mail is not misused. We look to those federal decisions to determine what steps will be "reasonable and necessary" for the purposes of the federal rule. **160 The Court's decision in Van Leeuwen provides the most relevant guidance. In that case, the defendant mailed two 12-pound packages by registered mail from a town in Washington near the Canadian border. He listed the contents of the packages as "coins," used "a vacant housing area of a nearby junior college" as the return address, and drove a car with British Columbia plates. Id. at 249-50, 90 S.Ct. 1029. Those facts caused the postal official to suspect something was amiss, and the official detained the packages initially for an hour and a half while customs officials checked the addressee of one of the packages. Id. at 250, 90 S.Ct. 1029. They learned that that addressee was under investigation for trafficking in illegal coins, and the postal official held the other package until the next day when he confirmed that the other addressee was under investigation for the same crime. Id. At that point, a customs official sought a search warrant to open both packages. Id.
In considering whether the postal official had violated the defendant's Fourth Amendment rights by detaining his packages while he investigated them, Justice Douglas, writing for a unanimous Court, explained that, although the postal service could not open and search first-class mail without a warrant or a warrant exception, "even first-class mail is not beyond the reach of all inspection." Id. at 252, 90 S.Ct. 1029. The Court reasoned that "[t]he nature and weight of the packages, the fictitious return address, and the British Columbia license plates of respondent who made the mailings in this border town certainly justified detention [for an hour and a half], without a warrant, while an investigation was made." Id. As the Court explained, even if
"[t]heoretically-and it is theory only that respondent has on his side-detention of mail could at some point become an unreasonable seizure of 'papers' or 'effects' within the meaning of the Fourth Amendment. Detention for 1[1]//2 hours-from 1:30 p.m. to 3 p.m.-for an investigation certainly was not excessive; and at the end of that time probable cause existed for believing that the [first] package was part of an illicit project."
Id. at 252, 90 S.Ct. 1029.
In this case, the trial court reasonably could have found that Craig moved defendants' package only a few feet **161 from the mail hamper to the floor of the processing facility when she put it and other similarly sized packages in a package lineup. Similarly, the trial court could have found that the time that it took for Nikko to sniff the packages in the package lineup was minimal. That is, the trial court reasonably could have found that the minimal detention of defendants' package was reasonable and necessary in light of the facts that caused Craig to take defendants' package out of the mail hamper in the first place. We accordingly disagree with defendants' argument that, in briefly placing the package in a package lineup for Nikko to sniff, Craig's actions went beyond what the DMM authorized.
Defendants also argue, however, that Craig's actions interfered with their affirmative right to redirect the package during transit either by having it held for pickup, by having it sent to a different address, or by having it returned to Sholedice. On that issue, we note that, ordinarily, a package will be delivered to the address listed on the package. DMM 508.1.1.1. However, the addressee can alter when and where an express mail package will be delivered. An addressee *395 can ask that express mail be held at the post office for three to 30 days for later delivery or pickup, or ask that express mail be forwarded to a temporary address or a new permanent address. DMM 507.2.1.2-3. Additionally, a sender may mail a package using a "hold for pickup" label, which means that the package will be sent to a designated post office and held for a limited period of time until the addressee picks it up. DMM 508.7.2.1-2. Finally, noncommercial customers or their authorized representatives "may request to have their package intercepted and redirected to [the] sender." DMM 507.5.5.[15]
Defendants infer from the ability to request either a change in the time and place of delivery or that a package be intercepted and returned to the sender that they had a constitutionally protected possessory interest in the package while it was in transit. The state responds that, under **162 the DMM, defendants only had a right to ask that mail be redirected; they did not have an absolute right to have it be redirected.
We need not resolve that dispute to decide the point that defendants raise. Even if we assume that defendants had a right to have the package be redirected or returned to the sender and that those rights created a constitutionally protected possessory interest, it is difficult to see how taking defendants' package from the hamper and placing it on the floor for Nikko to sniff significantly interfered with those possessory interests. Defendants do not argue that they sought to redirect the delivery of the package or to request that it be returned to the sender, nor do they explain how Craig's actions actually interfered with the exercise of rights they never sought to exercise. Moreover, even if they had sought to exercise those rights, it is difficult to see how moving the package a minimal distance for a minimal time would have interfered with, much less significantly interfered with, the possessory interests that they identify. That is particularly true when the terms of the bailment expressly permitted Craig to take the "reasonable and necessary" steps that she did to check whether the mail contained contraband, poisons, or hazardous material.
We accordingly conclude that Craig acted consistently with the terms on which the USPS took possession of defendants' package when she took their package out of the mail hamper and put it in a package lineup for Nikko to sniff. Not only did the DMM 601.8.13 affirmatively authorize Craig, as a USPS postal inspector, to take "reasonable and necessary" steps to protect postal employees from "any potentially dangerous or injurious materials or substances found in the mail," but her actions did not significantly interfere with defendants' rights to redirect the mail or have it returned to the sender. Because Craig acted consistently with the terms of the bailment, we hold that taking the package out of the hamper and putting it on the floor for Nikko to sniff did not significantly interfere with defendants' possessory interests in the package.
We note three qualifications to that holding. First, our holding is limited to the situation that this case **163 presents-a situation in which the government actor (the USPS) possessed the package as a bailee and acted pursuant to the terms of the bailment. The second qualification is related to the first. This is not a case in which a government agency that was not the bailee (an outside police agency, for example) sought to interfere with property entrusted to a bailee. In that situation, the police would not be authorized as the bailee to take the actions that Craig took here, and we express no opinion on whether those actions-if taken by a government official other than the bailee-would constitute a seizure. Finally, the trial court reasonably could find on this record that Craig was not acting at the behest of an outside police agency when she took the package out of the hamper and put it in the package lineup. The trial court implicitly made that finding when it expressly found that the "reason" Craig took the package out of the hamper for Nikko to sniff was to *396 protect federal postal employees. This case accordingly does not require us to consider the issue that the Court of Appeals addressed in Barnthouse .[16]
One other point warrants mention. In analyzing the parties' contract rights under the DMM, we do not mean to suggest that defendants' constitutional possessory interests are necessarily coextensive with the terms of the bailment. However, we explained in Barnthouse that "[t]he concept of a possessory interest, as it is pertinent to Article I, section 9, is grounded in property law." 360 Or. at 415, 380 P.3d 952 ; see also id. (explaining that " Article I, section 9, emphasizes property law concepts in determining what qualifies as a protected possessory interest"). Without some explanation as to why defendants' constitutionally protected possessory interests were greater than the possessory interests created by the bailment, we are not persuaded that Craig's act of taking the package out of the hamper and putting it on the floor for Nikko to sniff significantly interfered with defendants' constitutionally protected possessory interests. Other courts have reached a similar conclusion. See Wayne R. LaFave, **164 4 Search and Seizure § 9.8(e) 1011-12 n. 173 (5th ed. 2012) (listing cases holding that a minimal detention of a package by both private and public mail services so that a trained dog could sniff it did not meaningfully interfere with the defendant's possessory interests and thus did not constitute a seizure).
Defendants advance an alternative argument based on Craig's answer to a hypothetical question. As noted above, at the suppression hearing, defendants asked Craig what she would have done if Nikko had not alerted to the package, and Craig answered that she would not have returned it to the ordinary stream of mail. Rather, she would have done a further investigation, which she described as "try[ing] to get ahold of M. Smith or Nathan * * * Sholedice" and "talk[ing] to them a little bit about the parcel to get some more information." Defendants infer from Craig's answer that, even if Nikko had not alerted, Craig would not have delivered the package to Smith unopened by the guaranteed delivery date of May 29. It follows, they contend, that, when Craig took the package out of the mail hamper and put it on the floor, she significantly interfered with defendants' possessory interest in having the package delivered by the guaranteed delivery date.
We note, as an initial matter, that Craig did not say that she would not have delivered the package unopened to Smith by the guaranteed delivery date if Nikko had not alerted; she said only that she would have processed the package separately while engaging in further investigation, which she testified meant trying to talk with defendants "a little bit about the parcel to get some more information."[17] Beyond that, the more difficult problem for defendants is that their argument is based on a hypothetical set of facts that never occurred. Specifically, defendants argue that, if Nikko had not alerted, Craig would have asked for consent before delivering the package and, in so doing, would have seized it.
**165 Nikko, however, did alert. Accordingly, the question is not whether Craig would have taken additional steps that would have amounted to a seizure if Nikko had not alerted. Rather, the question is whether the steps that Craig in fact took before Nikko alerted amounted to a seizure. If they did not, and they did not for the reasons explained above, then the only question that remains is whether, once Nikko alerted, Craig and Helton's actions amounted to an *397 unreasonable seizure; that is, after Nikko alerted, did having a postal inspector take the package to Smith's house in Lincoln City and ask for consent to search constitute an unreasonable seizure? We turn to that issue.
In considering whether Helton's actions constituted a seizure, defendants argue that this case is not materially different from our decision in Barnthouse . In considering that argument, we first describe our decision in Barnthouse . We then explain how this case differs from Barnthouse . In Barnthouse , a suspicious package arrived at the USPS mail sorting facility near the Portland International Airport. 360 Or. at 405, 380 P.3d 952. A drug-detection dog alerted in response to the package, and two Portland police officers, accompanied by a postal inspector, delivered the package to the addressee approximately two and a half hours before the guaranteed delivery time. Id. at 406, 380 P.3d 952. The addressee (the defendant in Barnthouse ) was not home, but one of the police officers spoke with him on the phone. Id. at 407, 380 P.3d 952. The officer identified himself as a Portland police officer, told the defendant he was investigating a suspicious package addressed to the defendant, and asked the defendant for consent to open the package. Id. The officer "explained that [the] defendant could refuse consent, but that, if he refused, the officers would apply for a search warrant." Id.
After consenting to the search, the defendant moved to suppress the evidence derived from the search. Id. at 408, 380 P.3d 952. He contended that the police officer had seized the package in violation of Article I, section 9, before he consented to the search. Id. The trial court granted the defendant's motion, and we upheld the trial court's ruling. Id. at 421, 380 P.3d 952. Our decision began from the proposition that the addressee (the defendant) was the third-party beneficiary of the agreement between the sender and the USPS
**166 and, as such, had a property-based right to have the package delivered to him by its guaranteed delivery time. Id. at 415, 380 P.3d 952. We then held that the trial court reasonably could have found
"that, if [the] defendant had chosen not to consent to the search and instead required the officers to apply for a warrant, the officers would not have delivered the unopened package to [the] defendant while they sought a warrant, nor would they have permitted anyone else to deliver it to him, irrespective of its guaranteed delivery time. See [State v. ] Juarez-Godinez , 326 [Or. 1, 7, 942 P.2d 772 (1997) ] (appellate court is bound by trial court's factual findings in suppression hearing, as long as those findings are supported by evidence in record). Under those circumstances-that is, where, having physical control of the package, the officers curtailed its guaranteed delivery to [the] defendant-the trial court did not err in concluding that the officers significantly interfered with [the] defendant's possessory interest in the package and, therefore, seized it. See id. at 8 [942 P.2d 772] (describing seizure effected by curtailment of [the] defendant's possessory interest)."
Id. at 419, 380 P.3d 952.
Having concluded that the trial court could have found that the officer's statement effected a seizure, we explained that that finding did not end the inquiry "because * * * only seizures that are 'unreasonable' violate Article I, section 9." Id. at 420, 380 P.3d 952. The state, however, had not preserved its argument that the officers in Barnthouse reasonably suspected that the package was associated with criminal activity, and we did not decide whether the seizure was reasonable and thus constitutionally permissible. Id.
This case differs from Barnthouse in three respects, the last of which is material. In this case, Helton did not tell defendants, as the police officer did in Barnthouse , that, if defendants did not consent, Helton would apply for a warrant. Helton thus did not explicitly state that he would retain the package if defendants declined consent. Additionally, the trial court did not rule in defendants' favor, as the trial court did in Barnthouse . Because of that procedural difference, we do not draw all reasonable inferences in defendants' favor as we did in Barnthouse . Despite those two **167 differences, we still conclude that Helton seized the package at least temporarily. *398 It is undisputed that, when Helton came to Smith's house, he did not immediately give her the package as a mail carrier ordinarily would. Rather, he withheld delivering the package, told her that he was a federal inspector charged with investigating the misuse of the mail, said that he believed the package contained either drugs or the proceeds of drug sales, and asked her for consent to search it. Those acts constituted a sufficient show of authority that Helton seized the package. See Juarez-Godinez , 326 Or. at 6, 942 P.2d 772 (explaining that a seizure of property may be accomplished either by physical force or by a show of authority). More specifically, a reasonable person would have understood from those acts that Helton was going to retain the package for a longer period of time than the USPS was authorized to do under the terms of the bailment. We do not mean to suggest that every request for consent constitutes a seizure. However, by retaining the package and asking for consent instead of immediately tendering the package to Smith, Helton seized the package at least temporarily. In that respect, this case is similar to Barnthouse .
This case, however, differs from Barnthouse in one way that is material. In Barnthouse , the state did not preserve its argument that any seizure was reasonable. 360 Or. at 420, 380 P.3d 952. In this case, it did.[18] On that issue, Smith acknowledges that, after Nikko alerted to the package, Craig and Helton may have had probable cause to believe that the package contained contraband. Although Sholedice does not concede the point, he does not dispute it. More specifically, Sholedice never explains why, in light of the trial **168 court's finding that Nikko's training and experience qualified under Foster , Nikko was not sufficiently reliable that his alert alone established probable cause. See Foster , 350 Or. at 177-78, 252 P.3d 292 (explaining the degree of reliability necessary to establish that a dog's alert, standing alone, establishes probable cause).
Moreover, when Nikko's alert is considered together with the factors that Craig identified that made her suspicious about the package, Craig's understanding that the package was being sent from an out-of-state address to an Oregon address listed as a medical marijuana grow, and Helton's detection of the odor of marijuana when he approached Smith's front door, we conclude that Helton had probable cause to believe that the package contained either drugs prohibited by federal law or the proceeds from illegal drug sales. Additionally, because the package was coming from out-of-state, Helton had probable cause to believe that defendants were in violation of state criminal law-i.e. , that the applicable 2014 exemption from state criminal laws for the possession and distribution of medical marijuana did not apply to the interstate sale or transportation of marijuana. See former ORS 475.309(1) (2013) (providing limited exceptions to state criminal laws prohibiting the possession and delivery of marijuana); former ORS 475.316 (2013) (same) ; former ORS 475.320 (2013) (same).[19]
Defendants argue that, even if Helton had probable cause to believe that the package *399 contained contraband, he needed a warrant to seize it. We note, as an initial matter, that Helton seized the package only long enough to ask for consent. If we apply the same standards to seizures of property that we apply to seizures of people, as Juarez-Godinez teaches, it is difficult to see why Helton's seizure was not equivalent to a permissible Terry stop for the purposes of asking for consent. See **169 Juarez-Godinez , 326 Or. at 6, 942 P.2d 772 (explaining that cases addressing the seizures of persons are instructive in deciding when property has been seized unconstitutionally). Beyond that, this court has long recognized an exception to the warrant requirement in these circumstances. This court explained in Owens that, "[w]hen an officer has probable cause to believe that an object he has lawfully discovered is contraband and, therefore, that a crime is being committed in his presence, he has the right to seize it." Owens , 302 Or. at 202-03, 729 P.2d 524 ; see State v. Elkins , 245 Or. 279, 284, 422 P.2d 250 (1966).[20] In Owens , for example, the court upheld the warrantless seizure of the defendant's purse because the officer had probable cause to believe it contained heroin. 302 Or. at 202-03, 729 P.2d 524 (alternative holding). Under Owens , the warrantless seizure in this case was constitutionally permissible.
Finally, defendants do not dispute that a federal warrant was necessary to search the package while it was in the postal service's possession and that it have would have taken 24 to 48 hours to obtain a warrant from a federal judge. Because Craig did not come across the package until the morning of May 28, 2014, and the guaranteed delivery time was 3:00 p.m. the next day, she reasonably could have concluded that a federal warrant could not have been obtained in time to deliver the package to Lincoln City. See State v. Snow , 337 Or. 219, 224, 94 P.3d 872 (2004) (determining that an exigency existed based on the officer's reasonable understanding). Indeed, the trial court's factual findings appear to accept that proposition. Faced with the likelihood that Smith would dispose of the contents of the package once it was delivered, Helton reasonably retained the package while asking for Smith's and Sholedice's consent to search.
As Justice Linde explained in State v. Brown , 301 Or. 268, 721 P.2d 1357 (1986), when officers have probable cause to believe that a stopped car contains contraband, they **170 can "offer the person [in possession of the car] an informed choice between consenting to an immediate search or having the automobile held for the time necessary to obtain a warrant." Id. at 295, 721 P.2d 1357 (dissenting opinion). In Justice Linde's view, no exigency justified a warrantless search of the car because the government could seize the car long enough to ask for consent or obtain a warrant. Id. The seizure was justified, in Brown and this case, on the ground that, if the officer did not retain control of the car or package long enough either to ask for consent or apply for a warrant, the defendant could dispose of the contraband contained in the car or package. In light of that reasoning, Helton's request for consent to search the package, which he retained only briefly, did not run afoul of Article I, section 9. To the extent that Helton's request for consent effected a seizure, his brief seizure of the package was reasonable. See Barnthouse , 360 Or. at 420, 380 P.3d 952 ("only seizures that are 'unreasonable' violate Article I, section 9").
We accordingly conclude that Craig did not seize the package when she put it in a package lineup for Nikko to sniff and that the seizure effectuated by Helton's request for consent was reasonable. Because both federal officials acted consistently with Article I, section 9, the trial court correctly denied defendants' motions to suppress.
The decisions of the Court of Appeals are reversed. The judgments of the circuit court are affirmed.

The safety issues for postal employees resulting from packages containing explosives, poisons, and "injurious objects" are self-evident. Additionally, Craig testified that packages containing drugs and drug proceeds can present safety issues for postal employees. She explained that "our carriers become victims of robbery because people know that there's drugs or drug proceeds going through the mail."

Craig testified that it would take two days for an express mail package to go from New Mexico to Oregon while priority mail would take two to three days to get to Oregon at one-third or one-fourth the cost.

To illustrate the latter point, Craig testified that, if an explosive device were sent through the mail, the sender may want the device to be left unnoticed at the address.

Nikko and his handler were part of a state drug-detection unit. As noted above, however, their only role was to test the packages that Craig selected for the odor of one of the four drugs that Nikko was trained to detect. When asked on direct examination whether he was responsible for "generat[ing] a[n] investigation," the handler answered, "No."

Before he arrived, Helton checked a database and learned that Michelle Smith lived at the Lincoln City address, leading him to conclude that she was the "M. Smith" to whom the package was addressed. The record does not reveal why Helton asked Smith if "Nathan" was at home; that is, the record does not disclose whether the database Helton checked revealed that the person listed on the package as the sender, Nathan Sholedice, also lived at the same address in Lincoln City.

The court's last statement is not completely consistent with the record, which the trial court appears to have noted when it added, "[c]ontacted Lincoln City Police Department. What the record shows is that Craig gave the package to another federal postal inspector, Helton, who drove the package to Lincoln City and took it to Smith's house. On the way, Helton contacted a local police officer for backup.

Helton testified at the suppression hearing (and Craig testified similarly) that "the proceeds *** of the illegal sale of controlled substances that are shipped through the United States mail service *** represent an inherent danger to our employees." Helton explained that, "[i]n other states, we have had cases where employees, letter carriers, have been robbed because criminals knew they were carrying the proceeds of controlled substances transactions. And they were robbed for those parcels, specifically."

Additionally, the court concluded that, even if Craig had unconstitutionally seized the package, Helton did not exploit any information that Craig had obtained when he asked for and received consent first from Smith and then from Sholedice.

At first blush, it might seem odd asking whether federal postal inspectors acted in violation of defendants' state constitutional rights. However, this court has held that evidence obtained in violation of Article I, section 9, is not admissible in Oregon courts to prove a criminal charge, even when the government official who obtained the evidence was from another jurisdiction. State v. Davis , 313 Or. 246, 254, 834 P.2d 1008 (1992).

In a commercial context, when a seller uses a common carrier to deliver goods to a purchaser, the seller retains title to the goods until the point of delivery, although the parties can agree otherwise. See Powerex Corp. v. Dept. of Rev. , 357 Or. 40, 47-48, 346 P.3d 476 (2015). At the suppression hearing, the relationship between Sholedice and Smith was undefined, and it is not clear who, as between them, owned the property that Sholedice sent Smith. We assume, however, that one or the other of them owned it.

Smith cites the USPS Administrative Support Manual (ASM), which she notes can be found on a postal employee website, to define the terms of the bailment. However, as we read the ASM, it does not define the terms of the agreement between the USPS and its postal customers. Rather, it defines the employment agreement between the USPS and its employees. For example, after stating that the postal service must protect the security of the mail from "unauthorized opening, inspection, or reading of contents ***; tampering; delay; or other unauthorized acts," the ASM provides "[a]ny postal employee committing or allowing any of these unauthorized acts is subject to administrative discipline ***." ASM 274.1 (2013). As we recognized in Barnthouse , the relevant agreement between the USPS and its customers is set out in the DMM.

An example may suggest the reason for defendants' focus on possessory rather than ownership interests. Suppose Hertz leases a car to a person, and the police briefly detain the leased car. The detention interferes with the possessory interests of the person who leased the car, but it does not necessarily interfere with Hertz's ownership interest in the car. In this case, Helton would have interfered with defendants' ownership interest in the package if he refused to deliver the package to them by the guaranteed delivery date. However, that refusal also would interfere with defendants' right to a timely delivery under the DMM. See Barnthouse , 360 Or. at 415, 380 P.3d 952. Perhaps because of that overlap, defendants have not argued that Craig's or Helton's actions interfered with their ownership interest in the package separately from any interference with their possessory interests in it.

We say appears because Sholedice never ties his argument directly to DMM 113.2.2, which he cited and described earlier in his brief. However, it is the only arguably applicable provision of the DMM that he cites.

When the Court decided Van Leeuwen , priority mail and express mail did not exist. However, as DMM 113.2.2 makes clear, the rule for first-class mail applies equally to priority and express mail.

Commercial customers have a broader range of options. They "may request to have their package redirected to sender, to a new postal delivery address, or to a Post Office as Hold for Pickup." DMM 507.5.5. Because Sholedice was not a commercial customer, the more limited provisions of the DMM governing retail customers define his rights.

In Barnthouse , the record permitted the trial court to find that the federal postal inspectors were working at the behest of the state police in interdicting drugs. Because the trial court ruled in favor of the defendant in Barnthouse , the Court of Appeals reasonably concluded that, in that case, the federal postal inspectors were not acting independently pursuant to the terms of the bailment, as the trial court implicitly found in this case.

As noted above, the trial court found that, "if the dog had not alerted or no alert, there would have been further investigation." Although the trial court did not explicitly say what the "further investigation" would have entailed, the trial court's harmless error conclusion suggests that "further investigation" would have included asking for consent before tendering the package to Smith.

Smith argues that the state failed to make a timely argument in her case in the Court of Appeals that any seizure on Helton's part was reasonable. Because the state lost in the Court of Appeals, Smith argues that the state is barred from raising that issue on review in her case. As we read the Court of Appeals decision in Smith , it declined to allow the state to file the same supplemental brief that it had filed in Sholedice (arguing that Helton's actions, even if a seizure, were constitutionally reasonable) because the supplemental brief was not relevant to the ground on which the Court of Appeals decided Sholedice and followed in Smith . See Smith , 283 Or. App. at 423, 387 P.3d 499. The Court of Appeals did not decline to allow the state to file the supplemental brief because it was untimely. Had that been the ground of its decision, it presumably would not have allowed the state's petition for reconsideration. See id.

Sholedice mailed the package on May 27, 2014, before the law permitting the recreational use of marijuana became effective on December 4, 2014. See Or. Laws 2015, ch. 1, § 84 (identifying the effective date of the new marijuana law). Accordingly, the only applicable exceptions from the state criminal laws are found in the 2013 medical marijuana statutes. In any event, after instate possession and delivery of marijuana were decriminalized, Oregon has continued to make the interstate transportation of "marijuana items" criminal. ORS 475B.227(2) (2017), amended by Or. Laws 2018, ch. 103, § 21.

The exception that the court reaffirmed in Owens for warrantless seizures of property mirrors the exception for warrantless arrests of persons when the person is either committing a crime in the officer's presence or the officer has probable cause to believe the person has committed a felony. See United States v. Watson , 423 U.S. 411, 417-22, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (stating that rule under the Fourth Amendment, which reflects the common-law rule).